IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

GEORGIA OUTDOOR NETWORK, INC.,    *
J. STEVEN BURCH, JERE SMITH,
STEVE JACKSON, DOUGLAS N.          *
BERNHARD, RALEIGH BEATTY, and
ANDREW JOE STUBBS,                 *      CASE NO. 4:08-CV-108 (CDL)

        Plaintiffs,                *

vs.                                *

MARION COUNTY, GEORGIA,            *

        Defendant.                 *

_____   *

O R D E R

In this action, Plaintiffs challenge the constitutionality of an ordinance enacted by Defendant Marion County, Georgia to regulate outdoor recreation camps (the "Ordinance"). Presently pending before the Court are cross-motions for summary judgment (Docs. 16 & 19). For the following reasons, the Court finds that the Ordinance passes muster under the United States Constitution. Accordingly, Defendant's motion for summary judgment is granted as to Plaintiffs' federal law claims. To the extent Plaintiffs bring claims based upon the Georgia Constitution and Georgia law, the Court declines to exercise supplemental jurisdiction and dismisses those claims without prejudice.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Whether a challenged statutory enactment is unconstitutional is a legal question that must be resolved by the Court. *See, e.g., Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1427 (11th Cir. 1998). The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that judgment in its favor is proper as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

FACTUAL BACKGROUND

The following facts are taken from Plaintiffs' Statement of Material Facts in Support of Their Motion for Summary Judgment Pursuant to Local Rule 56 and are undisputed, unless otherwise indicated.

As early as 2004, Defendant determined that it needed to impose zoning restrictions on "hunting camps" within its borders. An attempt to enact an ordinance embodying these restrictions met with strong public resistance and was soon abandoned. In 2006, Steve White, the Marion County building code and zoning administrator, began to receive complaints about a hunting camp on Mill Pond Road. Largely in response to these complaints, Defendant drafted another ordinance seeking to impose zoning restrictions on hunting and fishing camps (the "Hunting Camp Ordinance"). Plaintiff Steve Burch and other members of Plaintiff Georgia Outdoor Network ("GONetwork")

expressed concern that the Hunting Camp Ordinance would be prejudicial to hunters and would serve no legitimate purpose, and they attempted to work with Defendant to improve the ordinance.[1] Ultimately, these attempts failed.   After GONetwork informed Defendant it would file suit to enjoin the Hunting Camp Ordinance, Defendant voluntarily agreed not to enforce it.  In the meantime, Dan Forster of the Georgia Department of Natural Resources suggested various revisions to the Hunting Camp Ordinance, particularly suggesting that the next version of the ordinance be geared towards regulating "outdoor recreation camps," or "ORCs" as opposed to strictly hunting and fishing camps.  This revised Ordinance, found in Article XI, Sections 11.03(O) and 11.09 of the Zoning Ordinance of Marion County, Georgia (the "Zoning Ordinance"), is the ordinance at issue in this case.

The Ordinance imposes various conditions on outdoor recreation camps in Marion County.  Among other things, the Ordinance requires that ORCs be located at least 100 feet from property lines, be screened from view, remain free from trash, and be accessible to Marion County zoning, tax assessing, and emergency personnel.  In addition, the Ordinance requires each housing unit located in an ORC (the "ORC Units") to pay a $50.00 permit fee per year.  An individual who violates, neglects, or refuses to comply with the Ordinance may

---

[1]GONetwork "is a Georgia not-for-profit corporation that operates as a voluntary association that seeks to protect and enhance the heritage and future of sportsmanship in Georgia and the land, water and wildlife on which it depends."  (Compl. ¶ 1.)

be "punished by imposition of the appropriate fine of up to $500.00 and/or imprisonment, for a period of not more than 60 days, at the discretion of the Probate Court." (Ex. 10 to White Dep. 57, Nov. 19, 2008 [hereinafter Zoning Ordinance].)  Each day a violation exists constitutes a separate offense.  (*Id.*)

Although GONetwork alerted Defendant to what it believed to be various deficiencies in the Ordinance, Defendant did not incorporate GONetwork's suggestions into the Ordinance.  On February 13, 2007, Defendant held a public hearing to discuss the Ordinance.  Plaintiff Steve Burch attended the hearing on behalf of GONetwork and again voiced the organization's concerns regarding the Ordinance, and Plaintiff Jere Smith also voiced his opposition to the Ordinance. At the conclusion of the February 13th hearing, the Marion County Commission voted to adopt the Ordinance.

Having lost the political battle, Plaintiffs resorted to the courts for help.  On July 24, 2008, Plaintiffs filed suit to enjoin enforcement of the Ordinance.  To avoid a preliminary injunction hearing and maintain the status quo until the legality of the Ordinance could be ruled upon, Defendant agreed to voluntarily suspend its enforcement of the Ordinance temporarily.[2]  The pending

---

[2]In addition to Plaintiffs GONetwork, Burch, and Smith, Steve Jackson, Douglas Bernhard, Raleigh Beatty, and Andrew Joe Stubbs joined in the instant action as Plaintiffs.  Burch is a member of the Bartram Trail Plantation Hunting Club, and he is also the current president of GONetwork; Smith is the "informal leader" of the Bartram Trail Plantation Hunting Club; Jackson and Beatty are members of the Triangle Sportsman and Hunting Club; Bernhard is a member of the Muckalee Sportsman's Association, Inc.; and Stubbs is a Marion County resident who hunts on 700

motions for summary judgment require the Court to determine whether the Ordinance is unconstitutional on its face due to vagueness, whether the Ordinance violates Plaintiffs' constitutional right to equal protection, and whether the Ordinance amounts to an unconstitutional taking of Plaintiffs' property.  For the following reasons, the Court finds that the Ordinance violates none of Plaintiffs' federal constitutional rights.

DISCUSSION

## I.   Federal Due Process - Void for Vagueness Challenge

Plaintiffs first assert that the Ordinance "unlawfully violates Plaintiffs' civil rights in contravention of 42 U.S.C. § 1983" because it is unconstitutionally vague under the federal Constitution.  (Compl. ¶¶ 29, 30.)  Plaintiffs contend that because the Ordinance does not carefully define its terms, persons of ordinary intelligence cannot know whether they are in violation of the Ordinance; moreover, Plaintiffs contend that the Ordinance's lack of specificity is likely to encourage arbitrary and discriminatory enforcement of its provisions.  (*Id.* ¶ 30.)  Plaintiffs seek a declaratory judgment voiding the entire Ordinance as unconstitutionally vague on its face.  (*Id.* ¶¶ 31, 43.)

"Vagueness arises when a statute is so unclear as to what conduct is applicable that persons 'of common intelligence must

---

acres of property in Marion County owned by Herm and Joyce Lancaster. (Compl. ¶¶ 3-7.)  Each individual Plaintiff hunts, lives, and/or owns property in Marion County, Georgia.

necessarily guess at its meaning and differ as to its application.'" *Wilson*, 132 F.3d at 1429 (quoting *United States v. Gilbert*, 130 F.3d 1458, 1462 (11th Cir. 1997)).   "The void-for-vagueness doctrine serves two central purposes: (1) to provide fair notice of prohibitions, so that individuals may steer clear of unlawful conduct; and (2) to prevent arbitrary and discriminatory enforcement of laws." *Mason v. Fla. Bar*, 208 F.3d 952, 959 (11th Cir. 2000). Thus, "[t]o overcome a vagueness challenge, a statute must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited; and it must provide explicit standards for those who apply them to avoid arbitrary and discriminatory enforcement." *Fla. Ass'n of Prof'l Lobbyists, Inc. v. Div. of Legislative Info. Servs. of the Fla. Office of Legislative Servs.*, 525 F.3d 1073, 1078 (11th Cir. 2008) (per curiam) (internal quotation marks omitted). When, as in this case, criminal penalties may be imposed for a person's failure to comply with a zoning ordinance, the ordinance should be drawn with a greater degree of precision. *See, e.g., Fla. Businessmen for Free Enter. v. City of Hollywood*, 673 F.2d 1213, 1218 (11th Cir. 1982).

Plaintiffs in this case mount a facial vagueness attack on the Ordinance. A facial challenge to an ordinance or other legislation seeks to invalidate the legislation itself. *Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1329 (11th Cir. 2001). The Eleventh Circuit has recognized "[s]ome disagreement . . . among members of

6

the Supreme Court on exactly how high the threshold for facial invalidation should be set." *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir. 1996).  Though this disagreement persists, *see, e.g., City of Chicago v. Morales*, 527 U.S. 41, 77-78 (1999) (Scalia, J., dissenting), all members of the U.S. Supreme Court appear to "agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep,'" *Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1190 (2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring)).[3]

It also appears to be universally recognized that a "'facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully[.]'" *Meggs*, 87 F.3d at 459 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Indeed, "[f]acial challenges are disfavored" for at least three reasons. *Wash. State Grange*, 128 S. Ct. at 1191.  First, facial challenges "often rest on speculation" and therefore "raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Id.* (internal quotation marks omitted).  Second, facial constitutional challenges "run contrary to the fundamental principle

---

[3]As the Eleventh Circuit understands the disagreement, "some Justices interpret Supreme Court precedent to indicate that a statute is not facially invalid unless there is *no* set of circumstances in which it would operate constitutionally; others contend the cases require only that a statute would operate unconstitutionally in *most* cases." *Meggs*, 87 F.3d at 459.

of judicial restraint that courts should neither anticipate a question of constitutional law in advance of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (internal quotation marks omitted). Third, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.*

Based on this standard, the Court concludes that the Ordinance, on its face, is not unconstitutionally void for vagueness. The Ordinance has a plainly legitimate sweep, and it does not pose a danger of arbitrary and discriminatory enforcement so great as to warrant voiding the enactment on its face.

A.   Challenges to the Definiteness of the ORC Provisions

Plaintiffs first contend that various provisions in the Ordinance are so vague and unspecific that they "fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Morales*, 527 U.S. at 56. The Court addresses each allegedly vague provision in turn.

1.   *Definitions of "Outdoor Recreation Camp" and "Recreation Facility, Commercial"*

Plaintiffs begin their vagueness challenge with what they allege to be "the most glaring constitutional defect with the Ordinance[,] . . . . its hopelessly vague and ambiguous definition of the term 'Outdoor Recreation Camp.'" (Pls.' Mem. Law Supp. Mot. Summ. J. 7

[hereinafter Pls.' Mem.].)  The Ordinance defines "Outdoor Recreation Camp" as "any location at which permanent or temporary housing facilities are located for the temporary occupancy by anyone engaged in recreational and/or sporting activities, which has more than one housing unit and in place for more than two consecutive weeks." (Ex. B to Pls.' Mot. Summ. J. 1 [hereinafter Ordinance].)  Plaintiffs assert that the definition is meaningless because it defines the "location" of an Outdoor Recreation Camp as the place where its temporary housing facilities are "located" without defining the boundaries of an ORC, without explaining how close together two or more ORC Units must be to be considered a single "location" under the Ordinance, and without providing whether two ORC Units must be located on the same tract of property to constitute an ORC. Plaintiffs also express concern that "[t]here is no definition of the connection that is required between the recreational or sporting activity and the temporary or permanent structure" and that the zoning enforcement officer is thus the sole arbiter of whether an activity constitutes recreation for enforcement purposes.[4]  (Pls.' Mem. 10.)

_____

[4]Plaintiffs also contend that the definition of ORC is vague because it "does not specify whether the mere existence of housing units for temporary use by people taking part in recreational or sporting activities is all that is required to create a[n ORC], or if actual occupation is necessary." (Pls.' Mem. 10.)  The Ordinance clearly covers the intended use of the property even if the ORC units are not actually occupied at a particular time.  The absence of a specific affirmation that actual occupation is not required does not make the Ordinance unconstitutionally vague.

Defendant contends that the Ordinance is sufficiently specific to place a reasonable person of ordinary intelligence on notice as to the type of facility the Ordinance regulates. The Court agrees. The definition of an ORC contains (1) a time requirement, i.e., a period of at least "two consecutive weeks" during which housing facilities must be in place; (2) a use requirement, i.e., "temporary occupancy;" (3) an activity requirement, i.e., persons must be "engaged in recreational and/or sporting activities;" and (4) a numerical requirement, i.e., "more than one housing unit." (Ordinance § A(1).) If a "hunting camp" has these features, then it would fall within the ORC definition. Some of the "hunting camps" described by the parties during this litigation would certainly be ORCs under the Ordinance: the camps consist of multiple permanent and/or temporary housing facilities for temporary occupancy (presumably during hunting season) that are left in place for longer than two weeks. (*See, e.g.,* White Dep. 50:19-51:22, 151:2-151:19 & 289:4-14.) Likewise, although the Ordinance does not define every conceivable "recreational" or "sporting" activity, activities such as "rifle or other firearm shooting, camping, [and] hiking" expressly fall within the Ordinance's ambit. (Ordinance § A(6).) The fact that the Ordinance clearly defines some regulated activity precludes a finding of facial vagueness. *See, e.g., High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228 (11th Cir. 1982) (finding that facial vagueness challenge failed when statutes clearly applied to prohibit the sale of some objects

offered for sale by merchants); *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 502 (1982) (rejecting facial vagueness challenge when the standard was "sufficiently clear to cover at least some of the items" sold by the plaintiff merchants). Because definition of "Outdoor Recreation Camp" has "a 'plainly legitimate sweep,'" *Wash. State Grange*, 128 S. Ct. at 1190, it cannot be facially vague.

Plaintiffs next argue that the commercial recreation exemption in the Ordinance is unconstitutionally vague such that no reasonable person could determine whether their activity is exempt. The Ordinance exempts "recreation facility, commercial" from its application. A "recreation facility, commercial" is defined in the Ordinance as "a recreation facility operated as a business and open to the public for a fee." (Ordinance § A(2).) Plaintiffs argue that this definition is vague because the Ordinance does not define the terms "recreation facility" or "open to the public for a fee" and the Ordinance does not describe the differences between a recreation facility and an ORC. (Pls.' Mem. 11.)

The Court finds that the exemption is sufficiently defined to place reasonable persons on notice as to whether they are exempt from the Ordinance's application. For example, it is clear that a public golf course or amusement park would be exempt from the ordinance because they are "recreational facilities" that are "open to the public for a fee;" yet a private hunting club would not be exempt

11

because it is not open to the public for a fee.[5]   Although creative
and clever attorneys in the comfort of their law libraries could
conceivably dream up some activity that falls in the grey area of the
exemption, such possibilities are not enough to make the Ordinance
constitutionally infirm on its face.

> ### 2.   Screening Requirements

Plaintiffs next attack section E of the Ordinance, which
requires "screening" of ORCs and associated parking areas created
after the date of enactment of the Ordinance.  Section E(1) provides:

> All Outdoor Recreation Camps and any associated parking
> areas created after February 13, 2007, shall be screened by
> trees, shrubs, plants and/or other natural buffers from the
> property lines, public roads and rights of ways.   If
> screens cannot be accomplished by natural means year round,
> then this shall be accomplished by the erection of a six
> (6) foot high privacy fence constructed of pressure treated
> material and located a distance of 100 feet from the
> property line, public roads and right of ways.

Plaintiffs argue that a citizen attempting to comply with the
provision "can never be reasonably sure his screen is in compliance,
whether by vegetation or a fence" because of the lack of specificity
in this provision of the Ordinance.  (Pls.' Mem. 12.)

---

[5]Even assuming a reasonable person could not decipher the ordinary
meaning of the terms "recreation facility" or "open to the public for a
fee," section A(7) of the Ordinance provides that terms not defined in the
Ordinance are defined as they are in the Zoning Ordinance.  If a term is
not defined in the Zoning Ordinance, the term "shall have the usual
meaning and connotation as is defined in Merriam-Webster On-Line search
at www.m-w.com/dictionary."   (Ordinance § A(7).)   Plaintiffs have not
argued how the definitions of these terms provided by this website are
unconstitutionally vague.

While the terms "screened" and "screen" are not defined in the Ordinance, the term "screening" is defined in the Zoning Ordinance as

> a visual and acoustical barrier which, through the use of buffers, natural topography, landscaping, fences, walls, beams or approved combination thereof, is of such nature and density that provides year-round maximum capacity from the ground to a height of at least six (6) feet that screens structures and activities on the lot from the normal level of a first story window on an abutting lot.

(Zoning Ordinance 12.)  While Plaintiffs acknowledge that terms not defined in the Ordinance may be defined by looking to the Zoning Ordinance, Plaintiffs contend that the Zoning Ordinance's definition of "screening" is inapposite.  Plaintiffs argue that the Zoning Ordinance definition requires imposition of "a physical element, which is different from requiring an Outdoor Recreation Camp to 'be screened'" and that the Ordinance requires ORCs to be screened naturally while the Zoning Ordinance does not.  (Pls.' Reply Br. Supp. Mot. Summ. J. 3-4 [hereinafter Pls.' Reply].)

The Court finds Plaintiffs' arguments unpersuasive.  The Ordinance permits screening either through use of natural elements *or* through the imposition of a man-made, physical barrier, and the Zoning Ordinance's definition of screening provides a sufficiently definite description of the amount of screening required.  The Court finds that the screening provision is not unconstitutionally vague.

### 3.   *Existing Wooded Buffer Provision*

Plaintiffs next contend section F(1) of the Ordinance, regarding existing wooded buffers, is unconstitutionally vague.  Section F(1)

13

provides, "All trees, shrubs[,] plants, and/or other natural buffers around an Outdoor Recreation Camp shall be preserved for a minimum width of fifty (50) feet.   However, brush cutting is allowed to reduce a fire hazard."   Plaintiffs argue that because the Ordinance does not define the perimeters of an ORC, there is no standard for locating the buffer.   Furthermore, Plaintiffs note that the terms "natural buffer" and "around" are not defined, further contributing to the vagueness of the requirement and inviting arbitrary and discriminatory enforcement.

Defendant points out that the term "buffer" is defined in the Zoning Ordinance as

> [t]hat portion of a given lot, not covered by buildings, pavement, parking, access and service areas, established as landscaped open space for the purposes of screening and separating properties with incompatible land uses, the width of which is measured from the common property line and extends the developed portion of the common property line.   A buffer consists of trees, shrubs, and other natural vegetation undisturbed by grading or site development and replanted where sparsely vegetated or where disturbed for approved access and utility crossings.

(Zoning Ordinance 4.)   Plaintiffs contend that applying this definition to the Ordinance is an "attempt[] to fit a square peg in a round hole" because the Zoning Ordinance defines a "buffer" as "landscaped open space" while the Ordinance seems to contemplate the preservation of any natural vegetation.   (Pls.' Reply 4.)   Plaintiffs also contend that the Zoning Ordinance's definition of "buffer" requires the buffer to be located along common property lines while

14

the buffer required by the Ordinance should simply be located "around" the ORC.

The Court agrees that the Zoning Ordinance's definition of "buffer" appears inconsistent with the Ordinance's requirements. To "landscape" is "to modify or ornament (a natural landscape) by altering the plant cover." Definition-Landscape, http://www.merriam-webster.com/dictionary/landscape[2]. Requiring the modification, ornamentation, or alteration of the natural landscape would thus seem fundamentally at odds with the Ordinance's buffer provision, which apparently requires the preservation of the natural landscape. It is also true that the Ordinance fails to define the boundaries of an ORC or describe the point from where the fifty-foot "width" must be measured.

These apparent inconsistencies do not doom the restriction, however. First, the purpose of the buffer requirement in the Ordinance is to serve as "a protective barrier thereby providing privacy for both the public and the [ORC] occupants." (Ex. 8 to Burch Dep. ¶ 12, Dec. 12, 2008; *see also* Zoning Ordinance 4 (noting that purposes of a buffer are "screening and separating properties with incompatible land uses").) The Ordinance accomplishes this purpose by prohibiting the removal of any existing trees, shrubs, plants, or other "natural buffers" from a fifty-foot wide zone encircling an ORC. The Ordinance's "failure" to define a set point to begin measuring this buffer zone simply provides the owners or

15

occupiers of the ORC with flexibility in determining exactly where the buffer shall be located.  As long as the person responsible for the ORC preserves at least fifty feet of natural buffer between the ORC and the adjacent property, the buffer should comply with the Ordinance.  Put differently, regardless of whether the fifty-foot buffer zone begins at the perimeter of the ORC, the property line, or somewhere in between, a buffer zone that encircles the ORC will provide a barrier between an ORC and neighboring properties and will presumably comply with the Ordinance.[6]

The Court also does not share Plaintiffs' concerns that reasonable persons will not be able to determine what constitutes a "natural buffer" for purposes of complying with the Ordinance.  The Ordinance specifically prohibits the removal of existing trees, shrubs, and plants in the "natural buffer" zone encircling the ORC.  While the term "natural buffer" is not defined, the Court finds that reasonable persons are on notice that wherever they decide to locate their fifty-foot wide "natural buffer" zone, they must preserve existing trees, shrubs and/or plants within the buffer to help provide a barrier between the ORC and adjacent property.  The possibility that certain hypothetical situations can be envisioned that may create some question as to whether the buffer meets the

_____

[6]Although "around" is not defined in the Ordinance, it is defined in the online version of Merriam-Webster's dictionary.  "Around," when used as a preposition, means "on all sides," "so as to encircle or enclose," or "in all directions outward from."  Definition-Around, http://www.merriam-webster.com/dictionary/around[2].

Ordinance's requirements is not enough to declare the Ordinance unconstitutionally void for vagueness. *See, e.g., High Ol' Times, Inc.*, 673 F.2d at 1228; *see also Vill. of Hoffman Estates*, 455 U.S. at 502.

### 4.   Target Practice Provisions

Plaintiffs next argue that the Ordinance's regulation of target practice "in or near and within 500 feet" of the ORC is unconstitutionally vague. Plaintiffs contend that the phrase "in or near and within 500 feet" is essentially meaningless; moreover, because the Ordinance does not define the boundaries of an ORC, it is impossible to tell whether target practice is occurring "in or near and within 500 feet" of an ORC. Additionally, Plaintiffs argue that the Ordinance provides no guidance as to what constitutes an "appropriate" earth mound, which must exist for target practice under the Ordinance.

The Ordinance defines an "appropriate" earth mound as one that would "prevent any single, solid projectiles from leaving the firing range." (Ordinance § H(1).)  This language is sufficiently specific to provide individuals with reasonable notice of what is required. While a sophisticated lawyer may have difficulty understanding what is necessary to prevent a round from leaving the firing range, the Court is convinced that a random survey of twenty persons on the square in Buena Vista could easily explain it.

In response to Plaintiffs' contention that the target range boundary requirement is vague, Defendant explains that the "in or near and within 500 feet" is to be read in the disjunctive, such that target practice occurring either "in" or "near and within 500 feet" of an ORC is regulated. (Def.'s Resp. to Pls.' Mem. 7.)  The Court finds that this phrase could have been made clearer.  "[I]n or near and within 500 feet" could be construed as Defendant suggests or as "in or near" *and* "within 500 feet."  Either way, however, the Ordinance requires appropriate earthen mounds to be constructed if target practice occurs (1) in an ORC or (2) within 500 feet of an ORC. Therefore, whether the boundary of an ORC is the footprint of the ORC Units or some broader boundary, it is clear from the Ordinance that anyone engaging in target practice within 500 feet of an ORC Unit would be required to construct earthen mounds to absorb their bullets or other single, solid projectiles.  If the Ordinance is enforced in this manner, it is not unconstitutional.  The target practice provisions of the ORC therefore have a plainly legitimate sweep, and they are not facially vague.

          5.   *Accessibility Provisions*

Plaintiffs also contend that the provision requiring that ORCs "be accessible for zoning inspection, law enforcement officials, Emergency Medical Personnel and tax assessing purposes" is unconstitutionally vague. (Ordinance § J(1).)  Plaintiffs argue that because the provision mandating accessibility also permits ORC owners

18

to lock the gates to their ORCs, it is self-contradictory and a reasonable person could not understand how to comply with the regulation.  Plaintiffs' contention is without merit.  A landowner could comply with the accessibility requirement while still keeping the gates to an ORC locked, for example, by providing keys or a lock combination to the various entities which require access to the ORC, or by meeting such entity at the locked gates to provide access. (*See, e.g.,* Ex. 8 to Burch Dep. ¶ 14.)  Alternatively, a landowner could decline to lock the gates to his or her ORC.  The Court finds that the Ordinance's accessibility requirement is not void for vagueness.

> 6.  *Location Provisions*

Finally, Plaintiffs contend that section D(1) of the Ordinance, which provides that "[a]ll Outdoor Recreation Camp Units created after February 13, 2007, shall be located at least 100 feet from any property line" is unconstitutionally vague.  Plaintiffs argue that the term "create" is "nonsensical when applied to section D(1) of the Ordinance, leaving an ordinary person only to guess what the term 'created' means in the context of the Ordinance."  (Pls.' Mem. 16.) Presumably, Plaintiffs maintain that a reasonable person could construe this provision to mean, for example, that only campers or tents "created" by their manufacturers after February 13, 2007 would be covered by this restriction.  This interpretation of the Ordinance is yet another example of creative lawyering ignoring common sense.

19

It is clear to the Court that any reasonable person would understand this provision to apply to such campers and tents that are *placed* in the ORC after February 13, 2007.  "Create" is defined by Merriam-Webster as "to bring into existence" or "to make or bring into existence something new."  Definition-Create, http://www.merriam-webster.com/dictionary/create.  Because an ORC Unit is defined as "any tent, pop-up camper, structure, camping trailer, motor home, recreational vehicle, mobile home, or other facility located in an Outdoor Recreation Camp," a reasonable person of ordinary intelligence could understand that an ORC Unit does not "come into existence" as such until the ORC Unit is "located in an Outdoor Recreation Camp." (Ordinance § A(5).)  This provision can be applied in a constitutional manner, and it is therefore neither nonsensical nor impermissibly vague.

    7.   *Additional Considerations*

    As a final note applicable to each of Plaintiffs' assertions of definitional vagueness, the Court observes that Defendant has made itself available to persons who question whether they are subject to various provisions of the Ordinance.  Since an ORC is a conditional use on agricultural-zoned land under the County zoning ordinance, an individual seeking to establish an ORC must obtain a conditional use permit through the Planning and Zoning Board. (*See, e.g.,* Def.'s Br. Supp. Mot. for Summ. J. 7-8; White Dep. 26:10-28:2.)  That Board is available to answer the applicant's questions or clarify the

20

requirements of the Ordinance.  (*See, e.g.*, White Dep. 195:2-20; *see also* Zoning Ordinance 22-23 (describing conditional use permit process).)  Such availability has been held to be a factor weighing against a finding that a legislative enactment is void for vagueness. *See Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374, 1378-79 (11th Cir. 1994) (finding that the term "substantial work" was not unconstitutionally vague on its face when town defined term for plaintiff); *cf., e.g., Mason*, 208 F.3d at 959 n.4 (noting that "the availability of advisory opinions to gauge the application of [the rule at issue] bolsters [the rule's] validity"); *cf. also Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) (finding it "important in rejecting the respondents' vagueness contentions" that a governmental body was "available to counsel employees who seek advice on the interpretation of" the statute and regulations at issue); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973) (noting that the Commission had established "a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law, at least insofar as the Commission itself is concerned").

In sum, the Court finds that the provisions in the Ordinance are sufficiently definite and specific to enable an ordinary person to understand what conduct the Ordinance regulates.  Therefore, it satisfies the first prong of the constitutional vagueness test.

B.   Arbitrary and Discriminatory Enforcement

Plaintiffs also contend that each challenged provision of the Ordinance "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement" and is therefore unconstitutionally vague. *Morales*, 527 U.S. at 56. In support of this contention, Plaintiffs specifically describe several instances in which Steve White, the Marion County zoning enforcement officer, stated that he would use his discretion to determine whether an ORC or an ORC unit was in compliance with the Ordinance. (*See, e.g.,* White Dep. 198:11-199:10 (White would "apply [his] own judgment" to determine how close two ORC Units must be to constitute an ORC); *id.* at 187:19-188:3 (an individual wanting to know if he is on an ORC for "recreational purposes" could ask White, who would interpret the Ordinance to answer).) Plaintiffs also argue that any "ad hoc 'clarification' of the Planning and Zoning Board suggested by Defendant invites arbitrary and discriminatory enforcement." (Pls.' Resp. to Def.'s Mot. for Summ. J. 3 n.1.)

Legislation may be unconstitutionally vague on its face if "it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute." *Kolender v. Lawson*, 461 U.S. 352, 361 (1983); *see also id.* at 358 (recognizing that "the requirement that a legislature establish minimal guidelines to govern law enforcement" is the most important aspect of the vagueness doctrine). As discussed above, the

22

zoning restrictions at issue are reasonably well defined by the Ordinance, and Defendant has offered to serve as a resource to resolve any questions regarding the extent of an individual's compliance.  The Court finds that under the circumstances of this case, the risk of arbitrary or discriminatory enforcement is not so great that this Court should second-guess the wisdom of the elected County Commission (who will also have ultimate authority to oversee its enforcement), and invalidate the Ordinance on its face.  *See, e.g., Vill. of Hoffman Estates*, 455 U.S. at 503 (finding that even though an ordinance gave police officers considerable discretion "to give meaning to the ordinance and to enforce it fairly," the speculative danger of arbitrary enforcement was not sufficient to render the ordinance facially void for vagueness); *High Ol' Times*, 673 F.2d at 1231 (holding that "regardless of the risk of discriminatory enforcement, a court may not hold that this risk invalidates the statute in a pre-enforcement facial attack").[7]

_____

[7]The presently-pending case is distinguishable from *City of Chicago v. Morales*, upon which Plaintiffs rely for the proposition that the possibility of arbitrary and discriminatory enforcement may invalidate an ordinance containing criminal penalties.  The Court in *Morales* found a city ordinance prohibiting "criminal street gang members" from "loitering" in public places violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *Morales*, 527 U.S. at 45-46.  The ordinance defined "loitering" as "remain[ing] in any one place with no apparent purpose."  *Id.* at 47.  The Court noted that it would be difficult, if not impossible, for "any citizen of the city of Chicago standing in a public place with a group of people [to] know if he or she had an 'apparent purpose.'"  *Id.* at 57.  Thus, the Court determined that the ordinance was "doomed" because of uncertainty regarding "what loitering is covered by the ordinance and what is not."  *Id.*
    The present case, however, involves a *zoning* ordinance.  Unlike the loitering ordinance at issue in *Morales,* "zoning resolutions, by their

23

In sum, the Court finds that Plaintiffs have not met their heavy burden of establishing that the Ordinance is unconstitutionally vague on its face.  The Court agrees with Plaintiffs that certain portions of the Ordinance could have been more artfully drafted.  This deficiency, however, does not render the Ordinance unconstitutionally vague on its face.  *See, e.g., High Ol' Times*, 673 F.2d at 1229 ("Although the Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties, we recognize that absolute precision in drafting laws is not demanded."); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").  Lawmakers must be afforded some degree of flexibility when they draft ordinances intended to have broad application, and "we can never expect mathematical certainty

---

very nature, put persons on notice that there are restrictions on the uses to which land can be put." *Rumpke Waste, Inc. v. Henderson*, 591 F. Supp. 521, 529 (S.D. Ohio 1984).  It appears relatively clear that many, if not most, persons who are part of an ORC already know that they need to acquire a conditional use permit from Defendant. (*See, e.g.,* White Dep. 279:21-280:2 (indicating that Defendant had received over 200 applications for conditional use permits for ORCs); *cf. also U.S. Civil Serv. Comm'n*, 413 U.S. at 579 ("Surely there seemed to be little question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether the conduct in which they desire to engage in was or was not prohibited by the Act.").)  And, as previously mentioned, upon application for a permit, Defendant will clarify portions of the Ordinance necessary to assist individual compliance with the Ordinance.  Thus, unlike the ordinance in *Morales*, this case does not present a comparably significant danger that individuals will not know their conduct is regulated until they receive a notice of their violation.

from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

While the flexibility inherent in any legislation regulating a person's conduct may be abused, "[i]nstances of arbitrary or discriminatory enforcement of the ordinance, like any other law, are best addressed when (and if) they arise, rather than prophylactically through the disfavored mechanism of a facial challenge on vagueness grounds." *Morales*, 527 U.S. at 111 (Thomas, J., dissenting); *cf. also Wash. State Grange*, 128 S. Ct. at 1190 (noting that judicial restraint is particularly appropriate in a case in which "the State has had no opportunity to implement [the challenged law], and its courts have had no occasion to construe the law in the context of actual disputes . . . or to accord the law a limiting construction to avoid constitutional questions").[8]   The Ordinance has a "plainly legitimate sweep" and the risk of arbitrary and discriminatory enforcement has not been shown to be so great as to warrant facial invalidation.   Plaintiffs' facial vagueness attack therefore fails.

## II.  Federal Equal Protection Challenges

Plaintiffs also contend that the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment to the United States

---

[8]The Court also declines to assume that Defendant "will take no further steps to minimize the spectre of discriminatory application of the law" that may "adequately narrow potentially arbitrary applications" of the Ordinance.   *High Ol' Times*, 673 F.2d at 1232; *see also Vill. of Hoffman Estates*, 455 U.S. at 502 ("Whether further guidelines, administrative rules, or enforcement policy will clarify the more ambiguous scope of the standard in other respects is of no concern in this facial challenge.").

Constitution and that such violation gives rise to a cause of action under § 1983. (Compl. ¶¶ 35-37.) Plaintiffs also seek a declaratory judgment declaring the Ordinance unconstitutional. (*Id.* ¶¶ 44-45.) Because the Ordinance does not target a protected class or implicate fundamental rights, the Court must apply the rational basis test to Plaintiffs' equal protection challenge.[9] *Bannum, Inc. v. City of Fort Lauderdale, Fla.*, 157 F.3d 819, 822 (11th Cir. 1998). Under rational basis review, Defendant must prevail if the Ordinance "is rationally related to the achievement of some legitimate government purpose." *Id.* Rational basis review involves a two-part inquiry. *Id.* First, the Court identifies "a legitimate government purpose–a goal–which the enacting government body *could* have been pursuing." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). Next, the Court asks "whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." *Id.* at 922. "As long as [the] reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational," the Ordinance will survive rational basis review. *Id.* (internal quotation marks omitted); *see also Grant v. Seminole County, Fla.*, 817 F.2d 731, 736 (11th Cir. 1987) (per curiam) ("The law is well

---

[9]Plaintiffs appear to agree that rational basis review applies to their federal equal protection challenge. (*See* Pls.' Mem. 17-21.)

settled that legislated zoning ordinances are permissible, constitutional uses of police power and are not reviewable by district courts unless they are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."). "[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Haves*, 52 F.3d at 922 (internal quotation marks omitted).

The Court first finds that legitimate public purposes that could have motivated Defendant to enact the Ordinance include the advancement of public health, safety, and welfare. *See, e.g., Grant*, 817 F.2d at 735 (concluding that legislation "enacted to further the health, safety and welfare" of a county's citizens "was legislated to further legitimate public purposes"). Plaintiffs' equal protection challenge thus rests on the second prong of rational basis review: Plaintiffs contend that various provisions in the Ordinance do not rationally advance Defendant's legitimate health, safety, and welfare goals. Plaintiffs argue that (1) individuals wishing to avoid regulation could simply avoid classification as an ORC, for example, "by simply not placing multiple housing units at the same location"; and (2) "the alleged concerns the Ordinance apparently seeks to address are just as applicable to solitary or permanent use or non-recreational housing as they are to multiple, temporary, recreational housing units regulated by the Ordinance." (Pls.' Mem. 20.)

27

The Court rejects Plaintiffs' arguments. Most of the Ordinance's provisions address specific concerns raised by Marion County residents. The sanitary facility requirements rationally relate to concern about waste disposal in ORCs. (Powell Dep. 54:13-25, Nov. 14, 2008; White Dep. 94:15-18 (describing complaints about hunters improperly disposing of waste from portable septic tanks).) The electrical requirements rationally relate to concern about safety in ORCs. (White Dep. 159:16-21 (describing hunting camp that had outdoor electric outlets that were not ground fault interrupt protected).) The setback, screening, buffer, and cleanliness requirements rationally relate to concerns regarding aesthetics and diminished property value. (*Id.* at 38:21-25; 94:8-12 (describing complaints about "how [camps] look[ed]").) The target practice provision rationally relates to complaints regarding shooting originating from ORCs and to safety concerns. (*Id.* at 94:13-15 (describing complaint from persons who had a stray bullet shot through their kitchen).) The 911 designation requirements rationally relate to concerns about the failure to display 911 numbers and to safety concerns. (Powell Dep. 54:15-16; White Dep. 93:25-94:7 (describing concerns with emergency services available to campers).) The remaining provisions—relating to accessibility and permit fees to cover inspection costs–are rationally related to Defendant's interest in monitoring ORC properties. (Powell Dep. 125:3-12.)

Moreover, the Court disagrees with Plaintiffs' contention that the problems the Ordinance seeks to address are just as applicable to solitary, permanent, or non-recreational housing.  Clearly, the more housing units located on a piece of property the more noise and waste the property will typically generate, even if only on a temporary basis.[10] It is also reasonable to conclude that persons staying in an ORC may engage more frequently in activities such as cleaning and processing fish and game, which generate additional waste and which may produce "objectionable views."[11]  (*See, e.g.,* Zoning Ordinance 19 (noting that reasons for "protective screening" include "reducing noise, night lighting, odor, objectionable views, [and] loss of privacy").)  Similarly, since one of the activities which the Ordinance labels "recreational" or "sporting" is firearm shooting, it is entirely reasonable to assume that persons frequenting ORCs engage in such activities more often than persons residing in other types of dwellings.  Finally, even if other potential sources of waste, noise, odor, and the like are permitted to exist without regulation, that is

_____

[10]The Court also notes that the Zoning Ordinance appears to treat similarly situated properties similarly.  For example, "Recreational Vehicle Parks" are required to have sanitary facilities, approved solid waste containers, grounded and weatherproofed electrical outlets, and permanent protective screens.  (*See* Zoning Ordinance 37-38.)

[11]As Plaintiffs point out, sections D and E accomplish much the same purpose as section F by requiring ORC Units to be located at least 100 feet from any property line and by requiring "screening" of ORCs.  This fact does not render F arbitrary and irrational, however.  Sections D and E only apply to ORC Units and ORCs "created" after February 13, 2007.  The "existing wooded buffer" requirement in section F would presumably provide at least some natural screening of already existing ORCs.

not dispositive of an equal protection challenge. "[E]qual protection does not require the government to address any particular problem in one fell swoop." *Haves*, 52 F.3d at 922 (internal quotation marks omitted).

In sum, the Court cannot conclude that Defendant's "purported motives were entirely devoid of rationality." *Bannum, Inc.*, 157 F.3d at 822-23, 824 (rejecting plaintiff's contention that an ordinance was facially unconstitutional because it required a residential social services program to obtain a special use permit while "declining to impose such a burden on other similar uses of property-such as multi-family residences, apartment houses, motels, hotels, foster homes, mobile home parks, convents and fraternity houses"). Accordingly, Defendant is entitled to summary judgment to the extent Plaintiffs allege an equal protection violation under federal law.

**III. Takings Challenge**

Plaintiffs next contend that sections D, E, F, H, I, and J of the Ordinance constitute a taking without due process of law and without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. (Compl. ¶ 33.) Plaintiffs contend that such a taking constitutes a violation of 42 U.S.C. § 1983, and they also seek a declaratory judgment declaring these provisions unconstitutional. (*Id.* ¶¶ 34, 38-41.) Plaintiffs fail to explain how sections D, E, H, I, and J constitute a taking

without just compensation, and thus these arguments are deemed abandoned. *See, e.g., Floyd v. Home Depot U.S.A., Inc.*, 274 F. App'x 763, 765 (11th Cir. 2008) (per curiam) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)) (affirming district court's dismissal of claim raised in complaint but not briefed in response to defendant's motion for summary judgment). Accordingly, the Court will analyze only Plaintiffs' contention that section F of the Ordinance amounts to an unconstitutional taking.

Because Plaintiffs' takings claim is a facial attack on the Ordinance, they must demonstrate that "the mere enactment of [legislation] constitutes a taking." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494 (1987). Plaintiffs therefore "face an uphill battle since it is difficult to demonstrate that mere enactment of a piece of legislation deprived [the owner] of economically viable use of [his] property." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997) (alterations in original) (internal quotation marks and citation omitted).

Plaintiffs argue that section F(1) of the Ordinance, requiring the preservation of natural buffers for fifty feet around an ORC, deprives a landowner of all economically beneficial use of the buffer property because it requires the land to be left in its natural state. (Pls.' Resp. 10.) Plaintiffs further contend that because the regulations do not explain how an ORC can ever cease being regulated as an ORC, such deprivation could occur permanently. (*Id.*

31

at 10-11.)[12]   The standard for determining whether this particular type of regulatory taking has occurred, however, "is not whether the landowner has been denied those uses to which he wants to put his land; it is whether the landowner has been denied all or substantially all economically viable use of his land." *Corn v. City of Lauderdale Lakes*, 95 F.3d 1066, 1072-73 (11th Cir. 1996); *see also Nasser v. City of Homewood*, 671 F.2d 432, 438 (11th Cir. 1982) ("Neither deprivation of the most beneficial use of the land nor a severe decrease in the value of property measures up to an unlawful taking." (internal citations omitted)).   Plaintiffs have made no showing that the "mere enactment" of the Ordinance will deprive landowners of all or substantially all economically viable use of their land; thus, Plaintiffs have not yet demonstrated a facial

---

[12]Plaintiffs also claim that the buffer provision of the Ordinance does not substantially advance legitimate state interests.  The Supreme Court disavowed this approach in *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 548 (2005) ("We hold that the 'substantially advances' formula is not a valid takings test, and indeed conclude that it has no proper place in our takings jurisprudence.").  The Court reaffirmed, however, that a Fifth Amendment taking can take the following forms: (1) a physical taking, e.g., when the government appropriates land for public use; (2) a total regulatory taking, i.e., when a regulation deprives an owner of all or substantially all economically viable use of her land; or (3) an adjudicative land-use exaction, e.g., where the government demands an easement allowing public access to property as a condition of obtaining a development permit.  *See id.*  Plaintiffs appear to argue only that the Ordinance effects a regulatory taking; they do not argue that Defendant physically appropriated their property or demanded public access.   In addition, *DeBenedictis* confirms that in a facial challenge to legislation regulating land usage, "the test to be applied . . . is fairly straightforward.   A statute regulating the uses that can be made of property effects a taking if it denies an owner economically viable use of his land. . . ."  480 U.S. at 495 (second alteration in original) (internal quotation marks omitted); *see also Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 296-97 (1981).

taking of constitutional proportions. *See, e.g., DeBenedictis*, 480 U.S. at 498 (noting that "[m]any zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property"); *see also Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 296 (1981) (rejecting facial takings claim in part because statute did "not purport to regulate alternative uses to which [property in question] may be put"). Accordingly, Defendant is entitled to summary judgment to the extent Plaintiffs assert a facial takings claim under federal law.

## IV.  Claims Under Georgia Law

Plaintiffs also bring various state law claims, contending that (1) the Ordinance violates the Due Process and Equal Protection Clauses of the Georgia Constitution; (2) Georgia law preempts any county legislation that purports to regulate hunting; and (3) any permit fees collected by Defendant are unlawful because the Ordinance violates the Georgia Constitution. Plaintiffs also contend they are entitled to attorney fees under O.C.G.A. § 13-6-11.

The state law claims in this case are complicated by several provisions of Georgia law. The Georgia Constitution provides that "[t]he tradition of fishing and hunting and the taking of fish and wildlife shall be preserved for the people and shall be managed by law and regulation for the public good." Ga. Const. Art. I, § 1, ¶ XXVIII. Georgia law reiterates this right by providing that "Georgia citizens have the right to take fish and wildlife, subject to the

33

laws and regulations adopted by the [Georgia Board of Natural Resources] for the public good and general welfare[.]" O.C.G.A. § 27-1-3(a). Georgia law further vests the Board with the sole power to "promulgate rules and regulations relating to hunting, trapping, and fishing." *Id.* § 27-1-3(h).[13] Plaintiffs argue that the Ordinance is preempted by Georgia law, specifically O.C.G.A. § 27-1-3, and that strict scrutiny of the Ordinance is appropriate because the Ordinance infringes on the "fundamental rights" of hunting and fishing as expressed by the Georgia Constitution.

Given the importance of the questions of Georgia law at issue in this case and the lack of controlling authority offered by the parties, the Court concludes that Plaintiffs' claims under Georgia law will be more appropriately adjudicated by a Georgia court. Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' Georgia law claims and dismisses those claims

---

[13]O.C.G.A. § 27-1-3(h) provides:

Except as otherwise provided by general law, the power and duty to promulgate rules and regulations relating to hunting, trapping, and fishing rests solely with the [Georgia Board of Natural Resources]. No political subdivision of the state may regulate hunting, trapping, or fishing by local ordinance; provided, however, that a local government shall not be prohibited from exercising its management rights over real property owned or leased by it for purposes of prohibiting hunting, fishing, or trapping upon the property or for purposes of setting times when access to the property for purposes of hunting, fishing, or trapping in accordance with this title may be permitted. Nothing contained in this Code section shall prohibit municipalities or counties, by ordinance, resolution, or other enactment, from reasonably limiting or prohibiting the discharge of firearms within the boundaries of the political subdivision for purposes of public safety.

without prejudice. *See, e.g., Grant*, 817 F.2d at 732 (finding that district court did not abuse its discretion in declining to exercise pendent jurisdiction over state law preemption claim where court would have been required "to decide a novel question of state law that was by no means clear cut"); *see also* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the claim raises a novel or complex issue of State law.").

CONCLUSION

Based on the foregoing, the Court concludes that Plaintiffs have failed to carry their substantial burden of establishing that the Ordinance is unconstitutional on its face. Such ordinances are typically presumed constitutionally valid, *cf. Grant*, 817 F.2d at 736, and facial challenges are typically disfavored, *Wash. State Grange*, 128 S. Ct. at 1191. Plaintiffs' arguments that the Ordinance's enforcement may, under certain circumstances, be unconstitutional do not make it unconstitutional on its face. Thus, as to Plaintiffs' federal constitutional claims, Defendant's Motion for Summary Judgment (Doc. 19) is granted and Plaintiffs' motion (Doc. 16) is denied. Plaintiffs' claim for attorney fees under 42 U.S.C. § 1988 must likewise fail, as it is predicated on Plaintiffs' unsuccessful challenge under 42 U.S.C. § 1983.

Of course, "in the future, courts can, to the extent necessary, evaluate the [Ordinance's] constitutionality as-applied. They can

also sever those parts of the [Ordinance], if any, that factual development shows can never be applied constitutionally." *Meggs*, 87 F.3d at 461.  The Court expresses no opinion regarding the constitutionality of any as-applied challenges that may arise in the future.

As previously noted, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismisses them without prejudice.


IT IS SO ORDERED, this 17th day of August, 2009.


S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

36